NOT DESIGNATED FOR PUBLICATION

No. 122,402

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; JANE A. WILSON, judge. Opinion filed October 2, 2020. Affirmed.

*Patricia Aylward-Kalb*, of Kansas City, for appellant natural father.

*Michael J. Nichols*, of Michael J. Nichols, P.A., of Kansas City, for appellant natural mother.

*Daniel G. Obermeier*, assistant district attorney, and *Mark A. Dupree Sr*, district attorney, for appellee.

Before MALONE, P.J., BUSER and POWELL, JJ.

PER CURIAM: The district court adjudicated A.H. to be a child in need of care (CINC). Mother and Father appeal, claiming there was insufficient evidence to support the adjudication. Father also claims the district court improperly shifted the burden of proof at the hearing from the State to the parents. For the reasons we will explain in this opinion, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Mother has a history with the Kansas Department for Children and Families (DCF); before the events of this case, her parental rights to two of her children had been terminated after proceedings in Kansas courts and her parental rights to a third child had

1

been terminated after proceedings in Missouri. Mother also has a history of drug use, including methamphetamine, which was an issue in the prior cases. In January 2018, Mother gave birth to A.H. and although she did not use drugs during her pregnancy because she was on probation, she completed her probation in March 2019.

By August 2019, Mother and A.H. were living with Father and paternal grandfather. On August 7, 2019, DCF received a hotline report that Mother had taken A.H. from that home and was living at an alleged drug house where she had no diapers, wipes, or clothes for A.H. When police went to conduct a welfare check, Mother argued with them for an hour and a half outside the house. According to the police, Mother seemed "high on drugs as she was really 'out there.'" Eventually, a relative, S.G., came and picked up A.H.

The next day, DCF social worker Sharon Griffin met with Mother and Father at S.G.'s home. Mother told Griffin that she was currently using methamphetamine and marijuana and that Father "was also using drugs," but she asserted that she wanted to stop using drugs. Father told Griffin that there were outstanding warrants for his arrest, but he intended to turn himself in and "do his time" so he could be a father to A.H. Mother, Father, and S.G. completed a safety plan agreeing that A.H. would remain with S.G. through August 20, 2019, to allow DCF to determine whether Mother and Father would receive family preservation services or if DCF would take A.H. into its custody.

Six days later, on August 14, 2019, Mother told Griffin that she had lied about currently using methamphetamine because she was angry during their previous conversation. Mother asserted that she had not used drugs for three years. Mother stated that she was a good parent and tried to explain to Griffin why her parental rights to her other children had been terminated.

On August 19, 2019, Griffin visited the home where Mother, Father, and paternal grandfather lived. She found "no items needed for [A.H.] to live there including a bed for her." Mother and Father stated that they would obtain all necessary items to take care of A.H. and they agreed to urinalysis (UA) drug testing, asserting the tests would be clean. Mother's subsequent UA was negative for all substances; Father's was sent to a lab for further testing and, at the time of the petition, the results were unknown. Because of the clean UAs and Mother and Father's willingness to participate in family preservation services, DCF did not take A.H. into its custody at that time.

At about 7:30 p.m. the next day, August 20, 2019, which was the day the safety plan was set to expire at midnight, Mother went to S.G.'s home accompanied by police and retrieved A.H. When S.G. informed Griffin that this happened, Griffin called police and requested a welfare check at Mother and Father's home. Police conducted the welfare check and informed Griffin that A.H. was safe, and that the family had the supplies needed to care for A.H.

The next day, August 21, 2019, Griffin went to Mother and Father's home. Father at first told Griffin that Mother was at a friend's house but later said that Mother and A.H. "were no longer living" at the home with Father and paternal grandfather. Father refused to tell Griffin where Mother and A.H. were staying, stating that he and Mother were not going to allow DCF to take A.H. Griffin left messages for Mother stating that she needed to hear from her by 8 o'clock the following morning, but Mother did not contact Griffin. So, on August 22, 2019, the State filed a petition seeking to adjudicate A.H. to be a CINC. The petition alleged that A.H. was without adequate parental care, control, or subsistence for reasons other than the parents' lack of financial means and that A.H. was without the care or control necessary for her physical, mental, or emotional needs.

The State asserted that it had made reasonable efforts to keep A.H. in her home by offering family preservation services with court oversight, but Mother and Father's

refusal to tell DCF where Mother and A.H. were living, combined with DCF's belief that Mother and Father "may still be using drugs," rendered those efforts unsuccessful. DCF also asserted that the refusal to reveal A.H.'s location and the parents' possible drug use constituted an emergency that warranted out of home placement, left A.H. "likely to sustain harm if she was not immediately removed," and made leaving A.H. in her parents' custody "contrary to [her] welfare." Thus, DCF argued that out-of-home placement was in A.H.'s best interests. DCF asked the district court to adjudicate A.H. to be a CINC and issue custody and child support orders.

The district court granted the State's request for an ex parte order of protective custody and placed A.H. in DCF custody. The district court later appointed a guardian ad litem (GAL) for A.H. and counsel for Mother and Father. On August 27, 2019, the district court held a hearing at which it placed A.H. in the temporary custody of DCF. DCF took physical custody of A.H. on August 29, 2019.

The district court held the adjudication hearing on October 24, 2019. Mother and Father both appeared in person and with counsel. Griffin was the State's sole witness and her testimony tracked the facts stated above. Griffin also testified that she was aware of Mother's prior involvement with DCF and, after the initial hotline report, she was concerned that Mother was "possibly using" drugs and that Father "might be using" drugs and had outstanding warrants. She stated that at the time of the adjudication hearing, she had not received the results of Father's UA. Griffin also testified that Mother removing A.H. from S.G.'s home violated the safety plan and that the officers who conducted the August 20, 2019 welfare check did not specifically tell Griffin whether A.H. had a bed or whether there was food in the home.

On cross-examination, Griffin conceded that it was possible that Mother and Father did not have the necessary supplies to care for A.H. at their home during her August 19, 2019 visit because they had taken all of those things to S.G.'s home. Even so,

4

once Mother and Father stopped cooperating with DCF, Griffin believed that A.H. was in danger. When asked whether she saw the parents behave erratically, Griffin stated, "Different times when I talked to them on the phone or they texted me, they seemed pretty erratic, pretty angry, frustrated with everything going on." She conceded, though, that it was not uncommon for parents to become angry at DCF involvement. Griffin testified that she had tried to call Mother and Father on August 20—the day the safety plan expired at midnight and the day Mother retrieved A.H. from S.G.'s house at about 7:30 p.m.—to tell them she and her supervisor had decided to try family preservation services. She also acknowledged that she had received messages that Mother was trying to reach her on August 20, but she did not speak directly with Mother that day.

Neither Mother nor Father called any witnesses, so the parties proceeded to closing argument. The State argued:

> "The long and the short of it is, Your Honor, we have a family who we were trying to offer family preservation, we were attempting to give services; and essentially, the safety plan was violated at the 11th hour. The child was then secreted away, and we could not contact the—the child, get ahold of the mother.
> "And based upon the extensive history that we had and the outstanding UA of the father, the State felt that it was in the child's best interest to keep her safe and to put her in a place where we could make sure that she was being well cared for.
> "And again, at the time of the—at the time of the TOC, the State does believe, and still does believe to this day, that the child is a child in need of care based upon the situation that she was placed in. And that's all I have."

Similarly, the GAL argued:

> "Judge, I'd say there's no question this child is a child in need of care based on what was happening at the time of the filing of this petition and based on the—the history of this family, and the drug use, and the meth use of the—of the parents that this Court knows about because we've had three prior cases. So—there were warrants out for father.

He—they were using drugs. Mom admits to using drugs, and then she said she lied about the fact that she used drugs and meth—and not just drugs but meth.

Mother argued that the State had not shown clear and convincing evidence that A.H. was a CINC. She noted there was no evidence about who made the initial hotline tip and a welfare check at that time showed A.H. was apparently fine. Mother's subsequent UA was clean, and no evidence suggested that Father's was not clean as well. Mother acknowledged that she and Father had agreed to a safety plan that ended on August 20, and asserted that when they tried but could not reach Griffin that day, Mother went to get A.H. Mother noted the presumption of parental fitness and that it is the State's burden to show by clear and convincing evidence that A.H. was a CINC. Finally, Mother argued that her prior CINC proceedings with her other children were irrelevant absent some indication that the same problems existed here. Father agreed with Mother's closing argument, and he also noted that the police welfare check on August 20, 2019 showed that all of A.H.'s needs were being met.

The district judge ruled from the bench:

"I know it's not ideal to have DCF in your home. I know that it's inconvenient. But that doesn't warrant the actions that the parents took part in in this case.

"It sounds like you were on a good track with DCF. You were going to get family preservation, get your child back in your home once you had what was needed in the home, and the child would have been returned to your home.

"But a phone call—failing to return a phone call doesn't warrant them going and taking the child, and then hiding the child. Dad said he wouldn't tell them where they were. I haven't heard anything other than that, except that's what was told to the worker. And that's concerning.

"Mom admitted to using drugs to the DCF worker one day and then denied it the next day.

"I—I understand the arguments, but I just—I do find by clear and convincing evidence that this child is a child in need of care, under 38-2202(d)(2)."

6

The journal entry reflected that the district court found that there was clear and convincing evidence that A.H. "is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian" and "is without the care or control necessary for the child's physical, mental or emotional health." Thus, the district court adjudicated A.H. to be a CINC.

Father and Mother each timely appealed the CINC adjudication, and the district court appointed appellate counsel to represent them. The record on appeal contains a review report prepared by a court services officer and filed in the district court on January 17, 2020. That report states that as of November 30, 2019, A.H. had returned to live with Mother and Father, but DCF retained legal custody. At that time, Mother was receiving family preservation services and Father was on probation.

ANALYSIS

*Was there clear and convincing evidence to support the adjudication that A.H. was a child in need of care?*

Father and Mother each argue that there was not clear and convincing evidence to support the district court's finding that A.H. was a CINC. The State disagrees.

"Before a district court can adjudicate a child to be in need of care under K.S.A. 2018 Supp. 38-2251, the State must prove by clear and convincing evidence that the child's circumstances fit within one of the criteria defining 'child in need of care' under K.S.A. 2018 Supp. 38-2202(d). . . .

. . . .

"When we review a district court's determination that a child is in need of care, we determine whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that the circumstances met at least one of the criterion in the statutory definition of a child in need of care. In making this

7

determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. And to the extent our review requires us to interpret [statutory] provisions . . . , which is a question of law, we have unlimited review. [Citations omitted.]" *In re D.H.*, 57 Kan. App. 2d 421, 429-30, 453 P.3d 870 (2019).

Here, the district court found that A.H. was "without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian" and she was "without the care or control necessary for the child's physical, mental, or emotional health." See K.S.A. 2019 Supp. 38-2202(d)(1)-(2). Although the district court cited only one of these provisions when ruling from the bench, this court reviews the ruling as based on both provisions because both were in the written journal entry. See *Valadez v. Emmis Communications*, 290 Kan. 472, 482, 229 P.3d 389 (2010) (holding that a written journal entry approved by the court controls over an oral ruling from the bench in a civil case).

In *In re D.H.*, a panel of this court stated that

"the temporal scope of the circumstances to be considered by the district court in deciding whether to adjudicate a child as one in need of care must be based on the plain language of the statutory criteria upon which the court is making the adjudication decision. If the statutory criterion is framed in the present perfect tense, then the adjudication decision will depend upon a view of the child's circumstances in the past and perhaps continuing to the present. If the statutory criterion is framed in the present tense, then the adjudication decision will depend upon a view of the child's present circumstances existing on the day of the adjudication hearing." 57 Kan. App. 2d at 429.

*In re D.H.* noted that K.S.A. 2018 Supp. 38-2202(d)(1) and (2) were written in the present tense. 57 Kan. App. 2d at 428-29. "Although the 'present circumstances' may encompass circumstances existing on the date the petition was filed, the court's

adjudication decision on whether a child is one in need of care should be based on the circumstances existing on the date of the adjudication hearing." 57 Kan. App. 2d at 429.

Here, there is no indication that the district court did not base its ruling on circumstances that existed at the time of the adjudication hearing, or at least on the date the CINC petition was filed. The State's evidence supporting the district court's adjudication of A.H. as a CINC can be summarized as follows:

- Mother has a history of drug use and her parental rights over three other children had been terminated.
- Mother violated the agreed safety plan by picking up A.H. early from S.G.'s residence.
- Father told Griffin that Mother and A.H. were no longer living at the home checked by the police, and Father would not tell Griffin where Mother and A.H. were staying because they were not going to allow DCF to take A.H.
- Mother told Griffin that she was currently using methamphetamine and marijuana, although she later tested negative for drugs.
- Mother told Griffin that Father was using drugs; Father also had warrants for his arrest and told Griffin that he planned to "do his time."
- Griffin testified that both parents acted erratically throughout her contact with them.

Mother and Father both emphasize that the police conducted a welfare check on their home on August 20, 2019 and told Griffin that the house was safe, but Griffin testified that the officers did not specifically tell her whether there was a bed in the house for A.H. or whether there was food in the home. But more importantly, Father told Griffin the next day that Mother and A.H. were no longer living in the home, and he

9

refused to tell Griffin where they were staying, so the fact that the police found the condition of the house to be adequate on August 20, 2019 is not all that relevant.

Upon reviewing all of the evidence presented at the hearing, viewed in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable that A.H. was without adequate parental care, control or subsistence and the condition was not due solely to the lack of financial means of the parents. See K.S.A. 2019 Supp. 38-2202(d)(1). We also are convinced by the same standard that A.H. was without the care or control necessary for her physical, mental, or emotional health. See K.S.A. 2019 Supp. 38-2202(d)(2). Thus, we reject the parents' claim that there was insufficient evidence to support the district court's CINC adjudication.

*Did the district court err by shifting the burden of proof to the parents?*

Father also argues that it was initially the State's burden to show that reasonable grounds existed to believe A.H. was being abused or neglected and because the district court did not hold the State to that burden and instead focused on the lack of justification for Mother and Father's actions, the district court impermissibly shifted the burden of proof. The State does not address Father's burden-shifting argument, other than to say that it is merely another facet of his argument about the sufficiency of the evidence.

As discussed above, the State bears the burden in CINC proceedings to "prove by clear and convincing evidence that the child's circumstances fit within one of the criteria defining 'child in need of care' under K.S.A. 2018 Supp. 38-2202(d)." *In re D.H.*, 57 Kan. App. 2d at 429. When deciding whether a district court improperly shifted a statutorily defined burden of proof, this court exercises de novo review. *Becker v. Knoll*, 291 Kan. 204, 212, 239 P.3d 830 (2010).

While ruling from the bench, the district judge noted that Griffin's failure to return a phone call on August 20, 2019, "doesn't warrant [Mother and Father] going and taking the child, and then hiding the child. Dad said he wouldn't tell them where they were. I haven't heard anything other that, except that that's what was told to the worker. And that's concerning." Father argues that this finding shows that the district court adjudicated A.H. to be a CINC based on the parents' failure to prove that A.H. was not a CINC, despite DCF's failure to meet its initial burden to show reasonable grounds to suspect that A.H. was abused or neglected.

The record does not support Father's claim that the district court improperly shifted the burden of proof. The district court made no statement suggesting that it based its adjudication of A.H. as a CINC on Mother or Father's failure to present evidence. Rather, the district court based its adjudication mainly on evidence the State provided of Mother and Father's retrieval of A.H. from S.G.'s care and subsequent refusal to disclose Mother and A.H.'s whereabouts. The fact that the district court commented that some of the State's evidence was not rebutted does not amount to burden shifting. Thus, we reject Father's claim that the district court erred by shifting the burden of proof to the parents.

Affirmed.